

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Ifco Recycling, Inc.<br><br>Recurrida<br><br>v.<br><br>Autoridad de Desperdicios Sólidos<br><br>Peticionaria | Certiorari<br><br>2012 TSPR 35<br><br>184 DPR ____ |

Número del Caso: CC-2007-95

Fecha: 27 de febrero de 2012

Tribunal de Apelaciones:

　　　　　Región Judicial de San Juan Panel IV

Jueza Ponente:

　　　　　Hon. Lourdes Velázquez Cajigas

Abogadas de la Parte Peticionaria:

　　　　　Lcda. Irma M. Pagán Villegas
　　　　　Lcda. Shirley S. Vokac
　　　　　Lcdo. Jubén Delgado Dávila

Abogados de la Parte Recurrida:

　　　　　Lcdo. Edgardo Colón Arrarás
　　　　　Lcdo. Antonio Bauzá Santos
　　　　　Lcdo. Alexis Hernández Rivera

Materia: Crédito Contributivo por Inversión

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| IFCO RECYCLING, INC.<br><br>RECURRIDA<br><br>v.<br><br>AUTORIDAD DE DESPERDICIOS SÓLIDOS<br><br>PETICIONARIA | Núm.: <u>CC-2007-0095</u> | *Certiorari* |

Opinión del Tribunal emitida por el Juez Asociado señor Feliberti Cintrón

En San Juan, Puerto Rico, a 27 de febrero de 2012.

Mediante el presente recurso nos corresponde interpretar el Artículo 21 de la Ley Núm. 70 de 23 de junio de 1978 (Art. 21 de la Ley 70-1978),[1] según enmendada,[2] disposición que no ha sido objeto de análisis anteriormente por esta Curia. Específicamente, nos toca resolver cuál es el procedimiento requerido por dicha disposición legal y por el Reglamento Núm. 5880 de la Autoridad de Desperdicios Sólidos de Puerto Rico y del Departamento de Hacienda de 18 de noviembre de 1998 (Reglamento 5880),[3] al solicitarse créditos contributivos

---

[1]    12 L.P.R.A. sec. 1318a (Supl. 2011).

[2]    Mejor conocida como "Ley de la Autoridad de Desperdicios Sólidos en Puerto Rico" (Ley 70-1978), 12 L.P.R.A. secs. 1301 *et seq.* (2007 y Supl. 2011).

[3]    El Reglamento 5880 es el "Reglamento Promulgado para Gobernar las Condiciones para la Concesión de Créditos por Inversión en una Facilidad Exenta a tenor con las Disposiciones del Artículo 21 de la Ley de la Autoridad de Desperdicios Sólidos en Puerto Rico, Ley Núm. 70 de 23 de junio de 1978, según enmendada".

para una inversión dirigida a renovar o expandir sustancialmente una facilidad de reciclaje, la cual ya había iniciado operaciones y previamente había sido certificada como exenta por la Autoridad de Desperdicios Sólidos (Autoridad o la peticionaria). Del mismo modo, debemos determinar si conforme a las antedichas disposiciones legales, la cuantía que se está invirtiendo para llevar a cabo los proyectos de renovación o expansión sustancial, es elegible para recibir los créditos contributivos solicitados.

I

La compañía IFCO Recycling, Inc. (IFCO o la recurrida) se incorporó en el Departamento de Estado de Puerto Rico en el año 1997. Ese mismo año solicitó a la Autoridad que, a tenor con lo dispuesto en el Artículo 21 de la Ley 70-1978 se le certificara como facilidad exenta por sus actividades de reciclaje parcial. La Autoridad evaluó la solicitud de IFCO, a la luz de lo dispuesto en el Artículo 21(g) de la Ley 70-1978, 12 L.P.R.A. sec. 1318a (g) (Supl. 2011), de la Carta Circular 97-05 del Departamento de Hacienda del 14 de abril de 1997 y del Reglamento 5880. Determinó que, luego de examinar las disposiciones legales pertinentes, entendía que las actividades de reciclaje llevadas a cabo por IFCO se enmarcaban dentro de la alternativa de "otras tecnologías

aprobadas por la Autoridad que sean ambientalmente seguras", por lo que la certificó como facilidad exenta.[4] En virtud de dicha Certificación, IFCO disfruta de una exención contributiva por sus actividades de reciclaje parcial[5] y para el servicio de distribución comercial y mercantil de artículos para mercados fuera de Puerto Rico, bajo las Secciones 2(d)(10) y 2(i)(1) de la Ley 135-1997 (13 L.P.R.A. secs. 10101(d)(10) y 10101(i)(1) (2007)).[6] Una vez reconocida como facilidad exenta, se le concedió un crédito contributivo del cincuenta por ciento (50%) de la inversión elegible de tres millones de dólares ($3,000,000.00), por lo que recibieron un crédito montante a un millón quinientos mil dólares ($1,500,000.00).[7] Mediante carta fechada el 18 de marzo de 1999, el Secretario de Hacienda reconoció el derecho de IFCO a reclamar dicho crédito.

Con fecha de 30 de julio de 2001, IFCO presentó ante la Autoridad una enmienda a la Certificación para ampliar la inversión elegible, dado que se aprestaba a aportar a

---

[4]    El 12 de abril de 1999 la Autoridad expidió a IFCO un Certificado de Facilidad Exenta y Crédito Contributivo (Certificación), en el Caso Núm. ADS-70-97-4.

[5]    Cuando IFCO fue certificada inicialmente sus actividades se limitaban al reciclaje parcial de papel y cartón. Posteriormente, en octubre de 2001 se enmendó la exención contributiva para incluir el reciclaje parcial de plástico, vidrio, aluminio, metales ferrosos y cualquier otro material reciclable.

[6]    Conocida como "Ley de Incentivos Contributivos de 1998".

[7]    Conforme a las disposiciones de la Ley 70-1978, la cantidad máxima de crédito por inversión que estará disponible a los inversionistas y a los participantes será de cincuenta por ciento (50%) del efectivo aportado por éstos como inversión elegible a la facilidad exenta. 12 L.P.R.A. sec. 1318a(b) (2007).

sus actividades de reciclaje una cantidad adicional de un millón quinientos mil dólares ($1,500,000.00). Reclamó, por lo tanto, un crédito contributivo ascendente a setecientos cincuenta mil dólares ($750,000.00). La nueva cantidad invertida estaría destinada a la construcción de veinticinco mil pies cuadrados (25,000 p$^2$) adicionales, que acrecentarían la capacidad de almacenamiento y ayudarían en el manejo de todas las toneladas de materiales a ser reciclados. Dicha solicitud fue aprobada por la Autoridad como una enmienda a la Certificación, dado que al momento de su presentación, la recurrida aún no había iniciado la construcción de sus facilidades de reciclaje.[8] Además, en varias ocasiones IFCO solicitó enmiendas a la Certificación con el fin de extender el tiempo necesario para concluir las construcciones e iniciar las operaciones.[9]

El 7 de octubre de 2004 la Autoridad certificó el comienzo de las operaciones de IFCO. Para ese momento,

---

[8]     La Autoridad basó su determinación en la Sección 2-10 del Reglamento 5880, el cual dispone lo siguiente en su parte pertinente:

> En todo caso en que se interese hacer una Inversión Elegible en una Facilidad Exenta en exceso de la cantidad provista en la Certificación de Facilidad Exenta, se requerirá una enmienda a la Certificación de Facilidad Exenta que refleje la aportación de capital adicional. Como regla general, y a menos que la Facilidad Exenta sea de tal magnitud e importancia que los mejores intereses del Pueblo de Puerto Rico requieran lo contrario, el Director Ejecutivo sólo atenderá solicitudes de enmienda a Certificaciones de Facilidad Exenta que sean radicadas antes del comienzo de la construcción o la Renovación o Expansión Sustancial de la Facilidad Exenta, y que sean motivadas por cambios sustanciales en el proyecto.

[9]     La primera enmienda para extender el tiempo se aprobó el 11 de octubre de 2000, mediante la cual se le concedieron dieciocho (18) meses adicionales, es decir, hasta el 12 de abril de 2002. La Autoridad extendió en tres ocasiones adicionales, a solicitud de IFCO, la fecha para el comienzo de operaciones. La última aprobación es de 30 de enero de 2004.

IFCO contaba con activos ascendentes a dieciocho millones setecientos treinta y tres mil setecientos veintiocho dólares ($18,733,728.00), producto de una fusión efectuada el 31 de octubre de 2003 con la compañía Industrial Fibers Corp.

El 5 de noviembre de 2004 IFCO solicitó otra enmienda a la Certificación de facilidad exenta con el fin de que se reconociera como inversión elegible una contribución adicional por la cantidad de dos millones cien mil dólares ($2,100,000.00). Dicha inversión iba dirigida a la adquisición de una maquinaria especializada tipo "streamline", la cual habría de utilizarse directamente en la operación de reciclaje de la recurrida y permitiría aumentar el volumen de material a ser procesado a setenta y ocho mil (78,000) toneladas al año.

No obstante, el 10 de junio de 2005 el Director Ejecutivo de la Autoridad le indicó a IFCO que lo peticionado no podía ser considerado como una enmienda a la Certificación, debido a que la solicitud fue presentada luego de haber concluido la construcción y de haberse iniciado las operaciones en la facilidad, lo que, según las disposiciones del Reglamento 5880, impedía el curso de acción solicitado. Manifestó que, en todo caso, la nueva inversión podría ser considerada como una expansión sustancial de la facilidad, de ésta ser elegible según los parámetros del Reglamento. IFCO solicitó reconsideración

de la determinación de la Autoridad. Sin embargo, ésta se sostuvo en su decisión.

Así las cosas, y no habiéndose autorizado la enmienda a la Certificación, el 2 de septiembre de 2005 IFCO presentó ante la consideración de la Autoridad una Solicitud de Certificación de Expansión Substancial de Facilidad Exenta y Créditos Contributivos por Inversión, según indicado por la Autoridad. En la misma, expuso que se disponía a aportar una cantidad en efectivo para la adquisición de una maquinaria y equipo "streamline" por un valor de dos millones cien mil dólares ($2,100,000.00). Alegó que dicha maquinaria era necesaria para expandir sustancialmente el proyecto de reciclaje y para aumentar la capacidad de recuperar, reciclar y reusar nuevos materiales tales como el papel, cartón, vidrio, aluminio, metales ferrosos y cualquier otro material reciclable. Declaró que, dada la naturaleza de la actividad que se disponían a realizar, la inversión debía ser considerada como una elegible, en virtud de las disposiciones del Artículo 21 de la Ley 70-1978, por lo que los inversionistas tenían derecho a reclamar el crédito correspondiente. Solicitó, por lo tanto, que se les otorgara un crédito del cincuenta por ciento (50%) del dinero invertido en la expansión sustancial de la facilidad exenta, equivalente a un millón cincuenta mil dólares ($1,050,000.00).

Posteriormente, y con fecha de 6 de diciembre de 2005, IFCO presentó una enmienda a su solicitud de expansión sustancial, con el propósito de aumentar la inversión propuesta a un total de cinco millones cien mil dólares ($5,100,000.00). Para fundamentar su solicitud, en la página 4 de su escrito, IFCO se expresó en los siguientes términos:

> La Inversión Adicional cualifica como Inversión Elegible según el artículo 21(j)(4) de la Ley y la Sección 2-10 del Reglamento. La inversión en la maquinaria y equipo "streamline" ($2,100,000) así como la inversión en la construcción de áreas de almacenaje y estacionamiento y la compra de equipos recolectores ($3,000,000), permitirá a la Peticionaria expandir su proyecto de reciclaje y aumentar la capacidad de recuperar, reciclar y almacenar nuevos materiales tales como el vidrio, aluminio, metales ferrosos y cualquier otro material reciclable.

> La Inversión Adicional se utilizará par[a] la adquisición de la maquinaria y equipo tipo "st[r]eamline," (incluyendo instalación eléctrica) necesaria para instalar dicha maquinaria de nueva tecnología en la Facilidad Exenta, a la construcción de las mejoras en la Finca Longo de Caguas y su alquiler, y a la compra de equipo de recolectores. La inversión en la maquinaria y equipo "streamline" y los recolectores, así como el desarrollo y construcción de mejoras en la parcela en el Barrio Longo en Caguas, constituye una inversión por la cual no se han otorgado créditos contributivos por Inversión anteriormente bajo la Sección 2-10 del Reglamento.

Argumentó la recurrida que la inversión adicional a realizarse cumplía con todas y cada una de las disposiciones de la Ley 70-1978 y el Reglamento 5880, por lo que los inversionistas tenían derecho a un crédito por

inversión ascendente a dos millones quinientos cincuenta mil dólares ($2,550,000.00).

Luego de evaluar la solicitud enmendada, la Autoridad encontró que la actividad propuesta de expansión sustancial que realizaría IFCO no era elegible para recibir el beneficio de los créditos contributivos por inversión, según lo dispuesto en la Sección 2-5 del Reglamento 5880. Fundamentó su decisión únicamente en el hecho de que en nuestra Isla ya existían entidades con una operación e infraestructura similar a la que IFCO proponía en su solicitud.[10]

El 23 de febrero de 2006, IFCO solicitó reconsideración de dicha denegatoria. Específicamente, incluyó como súplica:

a) Que se determine que IFCO ha realizado una expansión o renovación sustancial de acuerdo a la Sección 21 (g) de la Ley 70 y de las Secciones 2-1 y 2-13 del Reglamento 5880 teniendo ya una Certificación de Facilidad Exenta y que por lo tanto no tenga que cumplir con los requisitos de volver a tener que demostrar que cualifica bajo otras tecnologías ambientalmente seguras bajo el Artículo 21(g)(3) de la Ley 70 y la Sección 2-10 del Reglamento 5880.[11]

b) En la alternativa que se certifique la facilidad de "Single Stream" como una Facilidad Exenta dentro de la ya existente Certificación de Facilidad Exenta a base de

---

[10]    Dicha determinación fue notificada mediante carta fechada 16 de febrero de 2006.

[11]    Según las disposiciones del Reglamento 5880, entendemos que la sección a la que se refería la recurrida era a la Sección 2-5, en lugar de la Sección 2-10.

que la tecnología a ser utilizada reúne todos los requisitos establecidos en el Artículo 21(g) de la ley y el Artículo 2-10 del Reglamento 5880.

(Énfasis en el original y nota al calce nuestra).

La Autoridad, luego de acoger y evaluar la reconsideración de IFCO, emitió su decisión en carta fechada el 21 de junio de 2006. En la misma, mantuvo su determinación inicial de no otorgar los nuevos créditos por inversión. Entre los fundamentos esgrimidos por la Autoridad para sustentar su decisión se encuentran: (i) que la operación e infraestructura de la recurrida era similar a la de otras industrias existentes en el País; (ii) que estaba ubicada cerca de otra instalación que contaba con una maquinaria parecida de "single stream"; (iii) que ya había recibido sobre dos millones doscientos mil dólares ($2,200,000.00) en créditos contributivos y (iv) que parte del proyecto incluía la construcción de un área de estacionamiento, lo cual no era considerado por la Autoridad como una inversión directamente relacionada con el reciclaje, para poder justificar la concesión de créditos contributivos. Además, la Autoridad sostuvo que IFCO no había cumplido con el procedimiento establecido en el Artículo 21 de la Ley 70-1978 y en el Reglamento 5880, mediante el cual se tenían que volver a evaluar todas las disposiciones relativas a la certificación de entidades como facilidades exentas.

Inconforme con tal determinación, IFCO acudió mediante un recurso de revisión administrativa ante el Tribunal de Apelaciones (TA). Alegó que la Autoridad había errado al analizar la solicitud de expansión sustancial bajo los parámetros de la Sección 2-5 del Reglamento 5880 y al determinar que la inversión adicional no era elegible para recibir créditos contributivos.

Luego de varios escritos sometidos por ambas partes, el TA revocó la decisión de la Autoridad en una Sentencia emitida el 29 de diciembre de 2006.[12] Expuso lo siguiente como conclusión al primer señalamiento de error planteado:

> Nos resulta claro, que sólo cuando se concluye que la expansión envuelve una actividad diferente, es que procedería evaluar una propuesta de expansión bajo los criterios necesarios para calificar como una Facilidad Exenta. Si no existe tal diferencia, entonces lo que procede es indagar si el proyecto de expansión llena lo requerido por el Reglamento en la "Sección 2-13 Renovación o Expansión Sustancial". El volver a calificar el proyecto de expansión o renovación como una Facilidad Exenta, cuando no existe cambio de la actividad por la cual antes se calificó la facilidad como Facilidad Exenta, no lo autoriza ni requiere la ley y, además, conlleva una demora y gastos adicionales que no se justifican cuando la naturaleza de la operación es la misma que la del proyecto original, el cual luego de evaluación por la Autoridad obtuvo Certificación de Facilidad Exenta.

Sentencia del TA, a las págs. 22-23.

En cuanto al segundo señalamiento de error, el TA concluyó que los fundamentos utilizados por la Autoridad

---

[12] Archivada en autos y notificada a las partes el 12 de enero de 2007.

para decidir que la inversión a realizarse por IFCO no era elegible para recibir créditos contributivos, no encontraban apoyo en la Ley ni en el Reglamento. En particular, manifestó el foro apelativo intermedio que en ninguna parte de la Ley ni del Reglamento se impone un límite cuantitativo a los créditos contributivos a otorgarse, ni existen limitaciones sobre la cantidad de plantas de reciclaje por área geográfica. En cuanto a la inversión en un área de estacionamiento, estableció el TA que la misma comprendía una actividad relacionada al reciclaje, dado que por el tipo de operaciones a realizarse, se necesitan áreas donde: (1) recibir los camiones con desperdicios sólidos y donde estacionarlos en caso de que los mismos no puedan ser descargados inmediatamente; (2) almacenar su contenido si no se pueden procesar prontamente y (3) donde se puedan almacenar temporalmente los materiales reciclados, hasta acumular las cantidades necesarias a ser despachadas a los clientes.

Además de las expresiones atinentes a que la Autoridad se basó en criterios no pertinentes al denegar los créditos contributivos, así como que los fundamentos esgrimidos no encontraban base en la Ley ni en el Reglamento, el foro apelativo intermedio manifestó que la inversión cumplía con los requisitos establecidos en ley[13]

---

**13**    Refiriéndose a la Sección 2-13 del Reglamento 5880.

para evaluar un proyecto de expansión sustancial. Decretó, en primer lugar, que se trataba de una inversión a realizarse en una facilidad de reciclaje y que, además, la cuantía de la inversión era mayor al veinticinco por ciento (25%) del justo valor en el mercado de todos los activos de la Facilidad Existente.  Por lo tanto, revocó la resolución de la Autoridad y le ordenó que certificara al Departamento de Hacienda que el proyecto de expansión sustancial de IFCO era acreedor del crédito contributivo provisto en el Artículo 21 de la Ley 70-1978.

En desacuerdo con el dictamen del TA, la Autoridad acudió oportunamente ante nos planteando la comisión de los siguientes errores:

1. Erró el Tribunal de Apelaciones al determinar que los inversionistas privados para el establecimiento, renovación o expansión de plantas de reciclaje de desperdicios sólidos tienen como materia de derecho un crédito contributivo del 50% de su aportación en efectivo, sin que la Autoridad tenga que evaluar si la Industria cualifica o no como Facilidad Exenta.

2. Erró el Tribunal de Apelaciones al determinar que la solicitud de Certificación de Facilidad Exenta por Expansión y/o Renovación Sustancial de IFCO no tiene que ser calificada ni evaluada como Facilidad Exenta por haber obtenido una Certificación por una actividad anterior.

3. Erró el Tribunal al resolver que la inversión adicional [a] hacerse por IFCO en la Renovación o Expansión de su empresa es elegible para créditos contributivos por inversión bajo el Art. 21 y el Reglamento 5880.

Examinada la petición de *certiorari*, decidimos expedir el recurso solicitado y contando con la comparecencia de ambas partes, procedemos a resolver.

## II
### ARTÍCULO 21 DE LA LEY 70-1978 Y OTRAS DISPOSICIONES LEGALES APLICABLES

La Ley 70-1978 creó la Autoridad de Desperdicios Sólidos para que, entre otros propósitos, planificara, financiara y operara los servicios de trasbordo, procesamiento, recuperación y disposición final de los desperdicios sólidos para el uso de los municipios, agencias públicas y privadas. 12 L.P.R.A. sec. 1305(d) (Supl. 2011). Posteriormente, la Asamblea Legislativa, consciente del problema que representa tener un alto volumen de desperdicios sólidos que se generan diariamente y una pobre capacidad receptora en los vertederos, creó, mediante la Ley 70-1992 (12 L.P.R.A. secs. 1320 *et seq.* (2007 y Supl. 2011)),[14] un programa dirigido hacia la reducción y el reciclaje de los desperdicios sólidos. El mismo estaba enfocado primordialmente en la disminución del volumen de desperdicios que se depositaban diariamente en los vertederos y en el desarrollo de un mercado de material reciclado. En la Exposición de Motivos de la Ley 70-1992 se expuso:

---

[14] Conocida como "Ley para la Reducción y el Reciclaje de Desperdicios Sólidos en Puerto Rico".

Urge implantar unas soluciones ambientalmente seguras que redunden en la reducción del volumen de desperdicios sólidos que se tienen que disponer.

**Los sistemas de reducción y reciclaje en combinación con el uso menos intensivo de los vertederos representa una alternativa viable para Puerto Rico….**

La Asamblea Legislativa de Puerto Rico entiende que el país necesita implantar sistemas regionales para la reducción y el reciclaje de desperdicios sólidos, **estimulando la participación de la empresa privada en la construcción y operación de las instalaciones necesarias….**

(Énfasis nuestro).

Para lograr el propósito de desarrollar e implantar estrategias económicamente viables y ambientalmente seguras que resulten en la disminución del volumen de desperdicios sólidos, el Artículo 3 de la Ley 70-1992 contempló, entre otras medidas, la concesión de incentivos a las empresas participantes para estimular la recuperación de material reciclable y alentar la participación de la empresa privada en la construcción y operación de instalaciones de recuperación y reciclaje. Igualmente, impuso como una de las responsabilidades de la Autoridad, además de estimular la participación de la empresa privada en proyectos de reducción y reciclaje, el promover el fortalecimiento y la expansión de todas aquellas industrias que estuvieran en operación en ese momento. Art. 4 de la Ley 70-1992, 12 L.P.R.A. sec. 1320b (2007).

Del mismo modo, mediante el Artículo 18 de la Ley 70-1992 (12 L.P.R.A. sec. 1320(p) (2007)), se implantó un Programa de Incentivos Económicos que disponía que la Administración de Fomento Económico otorgaría incentivos contributivos para promover el establecimiento de industrias de reciclaje o de industrias que utilizaran el material reciclado para la confección de sus productos. Dicho precepto, además, le imponía a la Autoridad el deber de promover el desarrollo de incentivos contributivos adicionales a los provistos en dicha ley para promover el desarrollo de ese tipo de industrias.

Con el paso de los años, y aún abrumados con la cantidad de desperdicios sólidos producidos en la Isla diariamente, el 20 de enero de 1995 se aprobaron unas enmiendas a la Ley 70-1978, mediante la Ley 15-1995. Entre éstas se añadió el Artículo 21, con el propósito de conceder créditos contributivos a toda aquella persona o entidad que realizara una inversión en facilidades dedicadas a la disposición y/o el tratamiento de los desperdicios sólidos. En la Exposición de Motivos de la Ley 15-1995, se expresó que la incorporación del atractivo contributivo tenía la finalidad de fomentar la actividad industrial para lograr un manejo adecuado de los desperdicios sólidos.

El Artículo 21 de la Ley 70-1978, según aprobado, concede el derecho a obtener créditos contributivos por inversiones realizadas en facilidades de reducción,

disposición y/o tratamiento de desperdicios sólidos, sujeto a ciertas disposiciones de la Ley. En particular, establece el Artículo 21 de la Ley 70-1978 en su inciso (g) que serán consideradas facilidades de reducción, disposición y/o tratamiento de desperdicios sólidos: (i) los negocios exentos bajo la Sección 10039(e)(24) de la "Ley de Incentivos Contributivos de Puerto Rico"[15] y bajo la Sección 10101 incisos (d)(9) y (e)(24) de la "Ley de Incentivos Contributivos de 1998";[16] (ii) los dedicados a facilidades de rellenos sanitarios; (iii) los que produzcan energía mediante fuentes renovables limpias,[17] y (iv) cualquier otra tecnología aprobada por la Autoridad que sea ambientalmente segura. Toda industria que lleve a cabo alguna de las actividades enumeradas anteriormente puede, conforme al procedimiento establecido, solicitar ser cualificada como una facilidad exenta para efectos de recibir los beneficios de los créditos contributivos por inversión.

De la misma forma, y en lo pertinente al caso ante nos, detalla el Artículo 21 en su inciso (j), 12 L.P.R.A. sec. 1318a(j) (Supl. 2011), que podrán ser consideradas inversiones elegibles, para efectos de recibir los créditos contributivos:

---

[15]    13 L.P.R.A. secs. 10038 *et seq*. (2007).

[16]    13 L.P.R.A. secs. 10101 *et seq*. (2007).

[17]    Añadido a la Ley 70-1978 mediante enmienda realizada por la Ley 233-2006.

(1)     La cantidad de efectivo que haya sido aportada a una facilidad exenta para ser utilizada en una facilidad de reducción, disposición y/o tratamientos de desperdicios sólidos a cambio de: (i) acciones en la corporación, si la facilidad exenta es una corporación, o (ii) la participación, o el aumento en la participación, en una sociedad o empresa en común.

(2)     ....

(3)     ....

(4)     Sólo se consideran como inversiones elegibles aquellas inversiones cuyos fondos son utilizados en su totalidad única y exclusivamente para la construcción de una facilidad de reducción, disposición y/o tratamiento de desperdicios sólidos nueva o para la renovación o expansión sustancial de la facilidad de reducción, disposición y/o tratamiento de desperdicios sólidos existente, según definido en esta sección. Cualquier otra inversión cuyos fondos no sean utilizados directamente y en su totalidad para la construcción, renovación o expansión sustancial de una facilidad exenta, quedará excluida de la definición de inversión elegible de esta sección. En el caso de que se efectúe una de las aportaciones descritas en las cláusulas (1) o (2) del inciso (j) de esta sección, dicha aportación se considerará como inversión elegible sólo si dicha inversión se hace en la emisión primaria de las acciones o participaciones.

Una vez aprobada la Ley, y puesta la misma en vigor, se aprobaron una serie de enmiendas con el propósito de continuar incentivando la participación de la empresa privada en el manejo de los desperdicios sólidos. Como ejemplo de lo anterior, cuando la Ley 15 fue aprobada inicialmente, disponía en su inciso (b), que la cantidad máxima del crédito por inversión que estaría disponible a

los inversionistas no podía exceder del diez por ciento (10%) del costo total del proyecto o cincuenta por ciento (50%) del efectivo aportado por éstos, lo que fuera menor. Sin embargo, según plasmado en la Exposición de Motivos de la Ley 104-1996, "la Asamblea Legislativa de Puerto Rico ent[endía] necesaria la aprobación de [una] enmienda a la Ley de la Autoridad de Desperdicios Sólidos en Puerto Rico, con el propósito de **flexibilizar y desarrollar las inversiones en los proyectos relacionados con la disposición de desperdicios sólidos.**" (énfasis nuestro). Así, pues, la Ley 104-1996 enmendó el inciso (b) del Artículo 21, para disponer que la cantidad máxima del crédito por inversión que estaría disponible a los inversionistas, por cada proyecto, sería del cincuenta por ciento (50%) del efectivo aportado por éstos, disposición que resultaba más beneficiosa a los inversionistas.

El 18 de noviembre de 1998 fue aprobado el Reglamento 5880 promulgado para regir la concesión de créditos contributivos por inversión en facilidades exentas, según los términos y disposiciones del Artículo 21 de la Ley 70-1978. Por lo pertinente que resultan algunas de las secciones del Reglamento para la dilucidación de la controversia ante nos, a continuación haremos una breve exposición de las mismas. Dispone lo siguiente la Sección 2-5 de dicho Reglamento en su parte pertinente:

> Facilidad Exenta significa cualquier facilidad de disposición y/o tratamiento de desperdicios sólidos, según dicho término se define en el

apartado (g) del Artículo 21 de la Ley, que obtenga una certificación emitida por el Director Ejecutivo a tenor con las disposiciones de la Ley y de la Sección 3 de este Reglamento incluyendo, pero sin limitarse a:

a) Negocios Exentos bajo la Sección 2 (e)(24) de la Ley Núm. 8 de 24 de enero de 1987, según enmendada, conocida como "Ley de Incentivos Contributivos de Puerto Rico del 1987", la Sección 2 (e)(24) de la Ley Núm. 135 de 2 de diciembre de 1997, conocida como "Ley de Incentivos Contributivos de 1998", o cualquier ley sucesora de naturaleza análoga;

b) Aquellas actividades que se dediquen a facilidades de rellenos sanitarios….

c) Otras tecnologías aprobadas por la Autoridad. Estas tienen que estar en armonía con el Plan Regional de Infraestructura para el Reciclaje y Disposición de los Desperdicios Sólidos en Puerto Rico, aspecto a determinarse por la Autoridad. Estas deberán promover la reducción, reuso y reciclaje de los desperdicios sólidos en Puerto Rico, utilizar una tecnología ambientalmente segura y probada, y someter evidencia al respecto. Además, deberá cumplir con todas las reglamentaciones estatales y federales aplicables.

La Autoridad, a su discreción, podrá tomar en consideración cualesquiera otros factores que estime sean pertinentes para tal determinación, considerando los mejores intereses económicos y sociales del Pueblo de Puerto Rico.

A tenor con lo anterior, para que una facilidad de disposición y/o tratamiento sea certificada como facilidad exenta debe, además de realizar alguna de las actividades citadas en la sección que antecede, llevar a cabo el procedimiento establecido en la Sección 3 del mismo cuerpo legal.

La Sección 3 del Reglamento 5880 establece el procedimiento que deben seguir aquellas industrias que interesen ser certificadas como facilidades exentas. La misma establece:

Toda persona o entidad que interese una determinación de Facilidad Exenta bajo la Ley deberá someter conjuntamente con una solicitud los siguientes documentos, según sean aplicables:

(a) Una declaración jurada que contenga, en forma detallada y actualizada, la siguiente información:

(1) Nombre, dirección y número de seguro social de la persona o entidad que solicita la Certificación de Facilidad Exenta.

(2) Nombre y dirección del representante, si alguno.

(3) Naturaleza de la Facilidad Exenta.

(4) Nombre de los Inversionistas y sus números de seguro social, así como del promotor, presidente o socio gestor.

(5) Localización o ubicación de la Facilidad Exenta.

(6) Disposiciones legales bajo las cuales se solicita la Certificación de Facilidad Exenta y explicación de por qué califica para la misma.

(7) Un inventario de toda la propiedad mueble e inmueble que se proponga utilizar en la Facilidad Exenta.

(8) Número de empleos directos permanentes a tiempo completo que genera o generará la Facilidad Exenta y término dentro del cual se generarán dichos empleos.

(9) Número de empleos parciales que genera o generará la Facilidad Exenta y término dentro del cual se generarán dichos empleos.

(10) Monto de la nómina.

(11) Inversión realizada y/o que se realizará (descripción, procedencia y cuantía), incluyendo:

(a) presupuestos preparados para propósitos de estudios de

viabilidad o para propuestas de construcción, en los casos en que sea aplicable, carta de términos ("term sheet") de la institución financiera que proveerá financiamiento y

(b) estimado del crédito contributivo que estará disponible para los Inversionistas, y una propuesta de la forma en que este crédito se distribuirá.

(12) En los casos de Facilidades Nuevas, fechas estimadas en que comenzará la construcción y comenzará sus operaciones o, en los casos de Facilidades Existentes, fechas estimadas en que comenzará y finalizará su Renovación o Expansión Sustancial.

(b) Si es una corporación doméstica, una copia del certificado de incorporación emitido por el Departamento de Estado….

(c) Copia de los estados financieros auditados de los últimos dos años contributivos en los casos de Facilidades Existentes que emprendan una renovación sustancial, o, en los casos de Facilidades Nuevas, copia de los estados financieros sin auditar del último año contributivo del Desarrollador.

(d) Una certificación negativa del (i) Negociado de Recaudaciones, (ii) Negociado de Control de Puertos, (iii) Centro de Recaudación de Ingresos Municipales, y, en el caso de Facilidades Existentes solamente, (iv) Departamento del Trabajo y Recursos Humanos y, (v) Corporación del Fondo del Seguro del Estado, en el sentido de que ni el peticionario ni los inversionistas adeudan contribuciones, impuestos, arbitrios o derechos de clase alguna. Si el peticionario es una Facilidad Nueva, o nunca ha rendido planillas de contribución sobre ingresos ni pagado derechos sobre ninguna de las áreas cubiertas en este

inciso, la certificación negativa correspondiente deberá identificar al negocio como Facilidad Nueva o explicar las razones por las cuales no se han pagado los derechos correspondientes. Ninguna persona natural o jurídica que adeude contribuciones al erario podrá beneficiarse de los créditos por inversión provistos por la Ley y este Reglamento, a menos que esté acogida y cumpliendo con un plan de pagos debidamente aprobado por el Departamento de Hacienda.

(e) Permiso de uso, de construcción o de ubicación según la etapa en que se encuentre el proyecto.

(f) Patente Municipal (en el caso de Facilidades Existentes solamente).

(g) Descripción de las operaciones de la Facilidad Exenta, estrategia de ventas, clientes y flujograma de los procesos a utilizarse.

(h) Certificado de seguro de responsabilidad pública expedido por una agencia certificada por la Oficina del Comisionado de Seguros de Puerto Rico (en el caso de Facilidades Existentes solamente).

(i) Cualquier otro documento o información que el peticionario estime conveniente someter o que el Director Ejecutivo le requiera por ser necesario para llevar a cabo un examen completo y cabal de la solicitud del peticionario.

El peticionario tendrá que someter la solicitud correspondiente, en original y dos (2) copias, dirigida a la atención del "Director Ejecutivo de la Autoridad de Desperdicios Sólidos", acompañada de los documentos complementarios, por correo o personalmente. Al radicarse la solicitud en la Autoridad para la consideración del Director Ejecutivo, la misma deberá estar acompañada también de un cheque certificado o giro bancario o del Servicio de Correos de los Estados Unidos pagadero a la "Autoridad de Desperdicios Sólidos" por la cantidad de quinientos dólares ($500.00).

Además, el peticionario deberá someter una copia de la solicitud simultáneamente en la División de Exención Contributiva del Negociado de Asistencia Contributiva y Legislación del Departamento de Hacienda, acompañada de un cheque o giro postal a nombre del Secretario de Hacienda, de cuatrocientos dólares ($400.00), cantidad que el Departamento de Hacienda cobra por esta clase de opiniones, según lo provisto en la Ley Núm. 15 del 20 de julio de 1990 y su Reglamento, según enmendado. Estas cantidades podrán ser modificadas de tiempo en tiempo mediante reglamento o carta circular a esos efectos.

Una vez la solicitud esté debidamente radicada ante el Director Ejecutivo y el Secretario, el Director Ejecutivo determinará la elegibilidad del peticionario como Facilidad Exenta tomando en cuenta la naturaleza de las facilidades de disposición y/o tratamiento de desperdicios sólidos, el número de empleos generados; y cualesquiera otros factores que, a discreción del Director Ejecutivo, sean pertinentes para tal determinación, considerando los mejores intereses económicos y sociales del Pueblo de Puerto Rico.

Luego de que el Director Ejecutivo determine que el peticionario califica como una Facilidad Exenta lo notificará al Secretario. El Secretario determinará la procedencia y cuantía de los créditos por inversión solicitados, y, de determinar que los mismos proceden, emitirá su recomendación al Director Ejecutivo. El Director Ejecutivo emitirá la Certificación de Facilidad Exenta mediante comunicación escrita al Peticionario y al Secretario. La Certificación detallará todas las condiciones bajo las cuales es emitida, incluyendo:

(a) La fecha límite de comienzo de las operaciones de la Facilidad Exenta en el caso de Facilidades Nuevas, o para completar la Renovación o Expansión Sustancial en el caso de Facilidades Existentes, la cual salvo en casos excepcionales, no podrá exceder de un año desde la fecha de la Certificación de Facilidad Exenta;

(b) El costo total de la Facilidad Exenta y las partidas que podrán considerarse como parte del costo de la misma;

(c) Cantidad máxima tentativa del crédito por inversión disponible para la Facilidad Exenta, y

(d) Disposiciones relativas al recobro de los créditos concedidos en caso de que el peticionario no complete el proyecto propuesto dentro del término establecido.

En los casos en que el Director Ejecutivo determine que el peticionario no califica como una Facilidad Exenta, éste notificará por escrito la denegación mediante correo certificado, expresando las razones en las cuales se fundamenta su denegación….

Define el Reglamento 5880 lo que constituye una Facilidad Existente y una Facilidad Nueva, en las Secciones 2-6 y 2-7, respectivamente, de la siguiente manera:

Facilidad Existente significa un negocio en operación al momento que se radique debidamente la solicitud de Certificación de Facilidad Exenta bajo la Sección 3 de este Reglamento, que emprende una Renovación o Expansión Sustancial.

Facilidad Nueva significa un negocio que califique como una Facilidad Exenta que no esté operando al momento que se radique la solicitud de certificación bajo la Sección 3 de este Reglamento, cuyo costo total exceda de quinientos mil dólares ($500,000), y que utilizará facilidades físicas y maquinarias que no hayan sido utilizadas en una facilidad de disposición y/o tratamiento de desperdicios sólidos durante el período de dieciocho (18) meses anteriores a la fecha de radicación de la solicitud…. Asimismo, se considerará también como una Facilidad Nueva a todo negocio que, aunque haya sido utilizado como una facilidad de disposición y/o tratamiento de desperdicios sólidos durante el referido período de dieciocho (18) meses, sea adquirido con el propósito de ser sometido a una renovación de tal magnitud,

incluyendo maquinaria y equipo, que su costo excederá del doscientos por ciento (200%) del precio de compra del negocio, siempre y cuando dicha cantidad se invierta en su totalidad dentro del período de veinticuatro (24) meses de la fecha de la adquisición del mismo.

Por último, para que una facilidad que ha sido certificada como exenta pueda recibir los beneficios de los créditos contributivos, tiene que realizar una inversión elegible, según la misma es definida en la Sección 2-10 del Reglamento 5880 y la cual dispone en su parte pertinente:

Inversión elegible significa:

(1) La cantidad de efectivo que haya sido aportada a una Facilidad Exenta para ser utilizada en una facilidad de disposición y/o tratamiento de desperdicios sólidos a cambio de (i) acciones en una corporación, o (ii) participación en una sociedad; y

(2) …

(3) …

Sólo se considerará como Inversión Elegible aquella inversión cuyos fondos son utilizados en su totalidad única y exclusivamente para la construcción, incluyendo el costo de equipo y maquinaria por la cual no se hayan otorgado créditos contributivos anteriormente, de una Facilidad Nueva o para la Renovación o Expansión Sustancial, incluyendo el costo de equipo y maquinaria por la cual no se hayan otorgado créditos contributivos anteriormente, de una Facilidad Existente. Cualquier otra inversión cuyos fondos no sean utilizados directamente y en su totalidad para estos propósitos quedará excluida de la definición de Inversión Elegible de esta Sección.

En el caso de que se efectúe una de las aportaciones descritas en los incisos (1) o (2) de esta Sección, dicha aportación se considerará como Inversión Elegible sólo si se hace en la Emisión Primaria de las acciones o participaciones.

En todo caso en que se interese hacer una Inversión Elegible en una Facilidad Exenta en exceso de la cantidad provista en la Certificación de Facilidad Exenta, se requerirá una enmienda a la Certificación de Facilidad Exenta que refleje la aportación de capital adicional. Como regla general, y a menos que la Facilidad Exenta sea de tal magnitud e importancia que los mejores intereses del Pueblo de Puerto Rico requieran lo contrario, el Director Ejecutivo sólo atenderá solicitudes de enmienda a Certificaciones de Facilidad Exenta que sean radicadas antes del comienzo de la construcción o la Renovación o Expansión Sustancial de la Facilidad Exenta, y que sean motivadas por cambios sustanciales en el proyecto.

.....

La Sección 2-13 del Reglamento 5880 dispone los requisitos que deben cumplir aquellas Facilidades Existentes que deseen llevar a cabo una renovación de sus facilidades:

Una Renovación o Expansión Sustancial significa aquella actividad que conlleva una inversión dirigida a renovar, remodelar, o ampliar las facilidades físicas de una Facilidad Existente, incluyendo la adquisición de maquinaria y equipo, siempre y cuando la Renovación o Expansión Sustancial: (i) conlleve un costo mínimo de doscientos cincuenta mil dólares ($250,000), ó veinticinco por ciento (25%) del justo valor en el mercado de todos los activos de la Facilidad Existente, lo que sea mayor, y (ii) cuente con la aprobación previa del Director Ejecutivo.

Sobre las disposiciones legales pertinentes es necesario mencionar, por último, que tanto la Ley 70-1978 como el Reglamento 5880 conceden a la Autoridad la facultad de exigir informes mediante los cuales pueden investigar las operaciones de las facilidades exentas. Dispone el Artículo 5 de la Ley 70-1978 en su inciso (ff),

12 L.P.R.A. sec. 1305 (Supl. 2011), que la Autoridad puede "[r]equerir a toda persona o entidad sujeta a su jurisdicción que radique ante ella los informes y realizar [las] inspecciones o investigaciones necesarias para lograr los propósitos de [su ley orgánica]".

Además, una vez concedido un crédito por inversión y notificado a la Autoridad cómo éste ha de ser distribuido entre los inversionistas, la facilidad exenta debe, por el término de tres (3) años a partir de dicha notificación, rendir un informe anual al Director de la Autoridad y al Secretario de Hacienda desglosando el total de la inversión realizada en el proyecto a la fecha en que se está rindiendo dicho informe anual.

Del mismo modo, el Reglamento 5880 contiene disposiciones relativas a la capacidad que posee la Autoridad para solicitar dichos informes de las industrias a las que regula. Por ejemplo, en la Sección 13.1 del mencionado reglamento se detalla con mayor especificidad la información que debe contener el informe anual que viene obligada a rendir la entidad una vez ha recibido un crédito por inversión y ha notificado la distribución del mismo.

## III

### INTERPRETACIÓN DE LA LEY

Con el fin de solucionar las controversias y adjudicar los derechos que cobijan a las partes en un

pleito, los tribunales tenemos la ineludible labor de interpretar los estatutos aplicables a la situación de hechos en particular. R.E. Bernier y J.A. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, 2da ed. rev., San Juan, Pubs. J.T.S., 1987, Vol. 1, pág. 241. Dicho proceso de interpretar las leyes, que recibe el nombre de hermenéutica legal, consiste en auscultar, averiguar, precisar y determinar cuál era la voluntad legislativa al aprobar la ley. Íd. a la pág. 241. La hermenéutica legal, así como las reglas que lo rigen, se utiliza no sólo en la interpretación de los estatutos, sino también en la de los contratos, testamentos, reglamentos administrativos y cualquier otro tipo de documento. Íd.

Al adentrarse en esa delicada faena, el poder judicial debe tener como norte que de todas las reglas de interpretación hay sólo una que es absolutamente invariable y es que en dicho proceso "**debe descubrirse y hacerse cumplir la verdadera intención y deseo del poder legislativo**". R.E. Bernier y J.A. Cuevas Segarra, op. cit., a la pág. 242 (énfasis en el original). De ese modo, se ha establecido como principio esencial de la interpretación estatutaria que al lenguaje de la ley se le tiene que brindar aquel significado que le imprima validez al propósito que tuvo el legislador al aprobarla. Íd. a la pág. 245.

El Código Civil de Puerto Rico contiene una serie de disposiciones dirigidas a guiar el análisis e interpretación correcta de las leyes. Dispone el Artículo 14 del Código Civil, 31 L.P.R.A. sec. 14 (1993), que cuando la letra de la ley es clara y está libre de toda ambigüedad, la misma no debe ser menospreciada bajo el argumento de que se está tratando de cumplir con su espíritu. Sin embargo, lo anterior no significa que si nos encontramos ante un estatuto claro, este Tribunal se encuentre impedido de llevar a cabo su función como intérprete de las leyes. En varias ocasiones hemos expresado que todas las leyes, tanto las claras como las oscuras, requieren de nuestra interpretación. Consejo Titulares v. DACo, 181 D.P.R. 945 (2011).

Acorde a lo anterior, previamente adoptamos el principio de hermenéutica que dispone que "al aplicar una ley siempre es necesario interpretarla…. Eso es así ya sean oscuras o claras las palabras de la ley, por lo que se puede decir que es falso afirmar que sólo las leyes oscuras deben ser interpretadas". Consejo Titulares v. DACo, supra, a la pag. 958 (citando a R.E. Bernier y J.A. Cuevas Segarra, op. cit., a la pág. 259).

Embarcados en dicha tarea de interpretar las leyes, si nos encontramos con una cuyo contenido resulta confuso, sin lugar a dudas cobra mayor importancia y se hace aún más latente la necesidad de indagar cuál ha sido la verdadera intención del legislador al aprobarla. En esas

ocasiones debemos interpretar el estatuto considerando el propósito social que inspiró su creación y, teniendo dicho propósito en mente, darle un sentido lógico a todas sus disposiciones. Alonso García v. S.L.G., 155 D.P.R. 91, 99-100 (2001). Nos ayudará en dicho proceso considerar cuál era la naturaleza del problema o la necesidad existente que se procuraba atender mediante dicha legislación. CBS Outdoor v. Billboard One, Inc., 179 D.P.R. 391, 417 (2010).

Dispone el Artículo 19 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 19 (1993), que cuando las expresiones de una ley son dudosas, el medio más eficaz para descubrir el verdadero sentido de la misma es considerar la razón y espíritu de ella o los motivos que indujeron a la Legislatura a dictarla. En Sucn. Álvarez v. Srio. de Justicia, 150 D.P.R. 252, 274 (2000) (citando a Goss, Inc. v. Dycrex Const. & Co., S.E., 141 D.P.R. 342 (1996)), sostuvimos:

> Ante la letra de una ley ambigua o incierta tenemos la obligación de inclinarnos "*hacia aquella solución que mejor capte el impacto del estatuto en términos del bienestar general y que mejor perciba la intención legislativa al adoptar la norma enfilada a propiciar el interés público*".

(Citas omitidas y énfasis en el original).

Hemos mencionado en innumerables ocasiones anteriores, que los tribunales, como intérpretes finales de las leyes, nos encontramos en la obligación de lograr un análisis que se ajuste al propósito y a la política

pública que inspiró a la Legislatura al aprobarlas. Consejo Titulares v. DACo, *supra,* a la pág. 958. Dicha normativa tiene como objetivo lograr que, finalmente, la determinación que el tribunal realice asegure el resultado que el legislador quiso obtener al aprobar la ley. Íd. a la pág. 960. "Conforme con lo anterior, … en situaciones en las que exista alguna ambigüedad, este Tribunal rechazará una interpretación literal y forzada de un texto legal que produzca un resultado que no puede haber sido el que intentó el legislador." Asoc. Fcias. v. Caribe Specialty II, 179 D.P.R. 923, 939 (2010) (nota al calce omitida). Así hemos expresado que en aquellas ocasiones que nos encontramos con la letra de una ley que no es clara y cuya aplicación literal llevaría a un resultado absurdo o contrario a la verdadera intención del legislador, podemos, en nuestro proceso de interpretación, ignorar el contenido literal de la misma. Báez Rodríguez v. E.L.A., 179 D.P.R. 231, 245 (2010).

En Orsini García v. Srio. de Hacienda, 177 D.P.R. 596, 612 (2009), expresamos:

> A fin de cuentas, nadie puede comprender e interpretar la significación de cualquier legislación con la mera lectura de su texto, sin conocer el contexto histórico, cultural y social en el cual se aprobó. Se requiere, entonces, incluir en el análisis no tan sólo los elementos intrínsecos a la legislación, como son su exposición de motivos o sección de definiciones, sino también ciertos factores extrínsecos a ésta. Entre éstos, los tratadistas destacan: (1) los sucesos o puntos de vista contemporáneos a su aprobación; (2) la política y el orden público; (3) los informes de la comisión

legislativa que estudió el proyecto de ley; (4) el diario de sesiones, los anteproyectos, en fin, el historial legislativo; (5) la historia de la ley; (6) el momento de su aprobación; (7) las realidades sociales, políticas y económicas en el momento de hacer la interpretación, y (8) las condiciones existentes y costumbres arraigadas cuando se aprobó la ley….[18]

Por otro lado, hemos establecido que, dependiendo del objetivo que las impulsa, las leyes se interpretan de manera distinta. Así, dispusimos en Orsini García v. Srio. de Hacienda, *supra*, a la pág. 614 que:

Si el objetivo legislativo es beneficiar a los individuos, al Estado o reparar alguna situación de injusticia en particular, la interpretación deberá ser liberal. Por el contrario, si el objetivo está dirigido a limitar los derechos del Estado o de la sociedad en general, la interpretación debe ser restrictiva. La idea de estas formas de interpretación es facilitar que se cumpla con la finalidad de cada legislación.

Por último, hemos manifestado que al cumplir con nuestra función como intérpretes de las leyes, tenemos que armonizar, siempre que sea posible, todos aquellos estatutos involucrados en la solución de la controversia, de modo que se obtenga un resultado sensato, lógico y razonable. Asoc. Fcias. v. Caribe Specialty II, *supra*, a la pág. 940.

## IV

### INTERPRETACIÓN DE LAS LEYES CONTRIBUTIVAS

En innumerables ocasiones hemos señalado que los tribunales no debemos interpretar la legislación

---

[18]  R.E. Bernier y J.A. Cuevas Segarra, op. cit., a las págs. 242-243 y 369-386.

contributiva de forma extensiva, sino en forma justa de acuerdo con sus propios términos. Café Rico, Inc. v. Mun. de Mayagüez, 155 D.P.R. 548, 559 (2001). Del mismo modo, hemos expresado que: "las exenciones contributivas, por ser privilegios excepcionales que concede el Estado, no deben extenderse más allá de los términos expresos y exactos del estatuto que las otorga y toda duda debe resolverse en contra de la existencia de la exención…". Íd. a las págs. 559-560.

Sin embargo, también hemos establecido que, aún cuando "las leyes fiscales deben ser interpretadas restrictivamente, las mismas *tienen que ser interpretadas en forma jurídica y razonable*, teniendo en mente el propósito e intención general del legislador al aprobarlas". Roque González & Co. v. Srio. de Hacienda, 127 D.P.R. 842, 856-857 (1991) (énfasis en el original). Recientemente, manifestamos que dichas leyes "no deben ser interpretadas tan restrictivamente como para que pueda quedar frustrada la intención legislativa". Interior Developers v. Mun. de San Juan, 177 D.P.R. 693, 707 (2009). Además, indicamos en Orsini García v. Srio. de Hacienda, *supra*, a la pág. 616, que "las exenciones contributivas no se interpretarán restrictivamente si la intención legislativa de concederlas es clara e inequívoca, pues ello derrotaría el propósito del estatuto" (nota al calce omitida).

En *Pfizer Pharmaceuticals, Inc. y Pfizer Pharmaceuticals, Limited v. Municipio de Vega Baja*, 2011 T.S.P.R. 93, 182 D.P.R. ____ (2011), citando a *Textile Dye Works, Inc. v. Srio. de Hacienda*, 95 D.P.R. 708, 713 (1968), abundamos sobre el particular al exponer:

> [L]as exenciones industriales de contribuciones que concede el Gobierno de Puerto Rico no deben interpretarse como las antiguas exenciones contributivas las cuales eran privilegios, por cuya razón era beneficioso al interés público interpretarlos restrictivamente. Por el contrario, las exenciones industriales de contribuciones deben interpretarse en forma consonante con su principio creador. Sólo así se cumple la intención legislativa y además esa interpretación fiel y razonable es la interpretación beneficiosa al interés público. La exención industrial de contribuciones no es una gracia, en el viejo sentido de la frase, que el Gobierno de Puerto Rico confiere sino que es un instrumento que utiliza Puerto Rico, para fomentar la industria y la inversión productiva….

(Citas y énfasis omitido). Véase además, *P.R. Int. Paper Co. v. Srio. de Hacienda*, 100 D.P.R. 131, 135 (1971).

En *Proctor Mfg. Corp. v. Srio. de Hacienda*, 91 D.P.R. 829, 834-835 (1965) (citando a *Club Yaucano v. Srio. Hacienda*, 83 D.P.R. 623, 629 (1961)), en lo atinente a la regla de interpretación restrictiva de las exenciones contributivas, aclaramos que:

> [N]o significa que la ley tenga que ser interpretada con un celo de necesaria exclusión de los beneficios que concede la exención, sino meramente que no debe extenderse más allá del propósito legislativo discernible…, o sea, que la interpretación no puede ser tan estrecha y literal que derrote el propósito mismo del estatuto…. Todo cuanto se requiere es que la interpretación sea razonable.

**V**

**REVISIÓN JUDICIAL DE LAS DECISIONES ADMINISTRATIVAS**

La revisión judicial de las decisiones administrativas tiene como finalidad servir de control a la discreción concedida a las agencias administrativas, asegurando, de ese modo, que las mismas ejercen sus funciones conforme a la ley y de forma razonable. Empresas Ferrer v. A.R.Pe., 172 D.P.R. 254, 264 (2007). Mediante este mecanismo procesal se les provee a los ciudadanos un foro al cual acudir para obtener remedios y vindicar derechos frente a las actuaciones de los organismos administrativos. Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., 144 D.P.R. 425, 435 (1997). Por su intención, la revisión judicial "le impone una obligación especial a los tribunales de ser especialmente cuidadosos en revisar las decisiones en este campo para proteger la ciudadanía contra posibles actuaciones arbitrarias." Íd. a la pág. 435 (citando a Hernández Denton v. Quiñones Desdier, 102 D.P.R. 218, 223-224 (1974)). Así, hemos expresado sobre este particular:

> [L]os tribunales tenemos el deber de fiscalizar rigurosamente las decisiones de dichas agencias, para asegurar que desempeñen cabalmente sus importantísimas funciones, y para que el País no pierda la fe en sus instituciones de gobierno.

JP, Plaza Santa Isabel v. Cordero Badillo, 177 D.P.R. 177, 186 (2009) (citando a Empresas Ferrer v. A.R.Pe., supra, a las págs. 263-264).

La Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A. secs. 2101 *et seq.* (2006 y Supl. 2011), provee los parámetros que han de guiar la revisión judicial de las determinaciones administrativas al establecer en su Sección 4.5, 3 L.P.R.A. sec. 2175 (2006), que las determinaciones de hechos serán sostenidas por el tribunal, si las mismas están basadas en evidencia sustancial obrante en el expediente administrativo y que las conclusiones de derecho serán revisables en todos sus aspectos. Dicha sección dispone, además, que el tribunal concederá el remedio apropiado, de determinar que el peticionario es acreedor del mismo.

De ordinario, los tribunales le otorgamos deferencia a las determinaciones realizadas por las agencias administrativas, basado en la premisa de que son éstas las que poseen el conocimiento especializado sobre los asuntos que estatutariamente le han sido encomendados. <u>Torres Santiago v. Depto. Justicia</u>, 181 D.P.R. 969, 1002 (2011); <u>Mun. de San Juan v. CRIM</u>, 178 D.P.R. 163, 175 (2010). Por ello, hemos señalado que "una decisión administrativa goza de una presunción de legalidad y corrección que debe respetarse, mientras la parte que las impugna no demuestre con suficiente evidencia que la decisión no está justificada". <u>JP, Plaza Santa Isabel v. Cordero Badillo</u>, *supra*, a la pág. 187.

Sin embargo, en <u>Empresas Ferrer v. A.R.Pe.</u>, *supra*, a la pág. 264, expresamos las instancias en las cuales la

deferencia que consistentemente le hemos reconocido a las

agencias debe ceder.  Éstas son:

> (1) la determinación administrativa no está
> basada en evidencia sustancial; (2) el organismo
> administrativo ha errado en la aplicación o
> interpretación de las leyes o los reglamentos
> que se le ha encomendado administrar; (3) cuando
> el organismo administrativo actúa arbitraria,
> irrazonable o ilegalmente, realizando
> determinaciones carentes de una base racional, o
> (4) cuando la actuación administrativa lesiona
> derechos constitucionales fundamentales….

(Citas omitidas).

Distinto a la deferencia que se le concede a las

agencias administrativas al formular las determinaciones

de hechos, cuando de conclusiones de derecho se trata, los

tribunales tenemos una amplia facultad de revisar completa

y absolutamente las mismas.  Assoc. Ins. Agencies, Inc. v.

Com. Seg. P.R., *supra*, a las págs. 435-436.  Los

tribunales sostendrán las conclusiones de derecho del

organismo administrativo siempre que las mismas estén

conformes al mandato de la ley.  Martínez v. Rosado, 165

D.P.R. 582, 589 (2005).

Además de la deferencia que se le brinda a las

determinaciones de hechos enunciadas por las agencias

administrativas, anteriormente hemos establecido que los

tribunales igualmente le guardamos mucho respeto a las

interpretaciones de los estatutos que sean realizadas por

las agencias, como entes facultados para velar por su

administración y cumplimiento.  Torres Santiago v. Depto.

Justicia, *supra*, a la pág. 1003.

Sin embargo, también establecimos que la anterior norma "no constituye un dogma inflexible que impid[a] la revisión judicial si no existen las condiciones que sostienen la deferencia". Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., *supra*, a la pág. 436. Así, hemos sostenido que cuando la interpretación del estatuto realizada por la agencia produzca resultados que son incompatibles o contrarios al propósito para el cual se aprobó la legislación y a su política pública, el criterio administrativo no podrá prevalecer. Orsini García v. Srio. de Hacienda, *supra*, a la pág. 642. Es decir, la deferencia judicial al "expertise" administrativo, concedido cuando las agencias interpretan la ley, tiene que ceder ante actuaciones que resulten irrazonables, ilegales o que conduzcan a la comisión de una injusticia. Asoc. Fcias. v. Caribe Specialty II, *supra*, a las págs. 941-942; Mun. de San Juan v. CRIM, *supra*, a las págs. 175-176.

Citando al Catedrático Dr. Demetrio Fernández Quiñones, en Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., *supra*, a la pág. 436, abundamos sobre este particular como sigue:

> Ahora bien, la deferencia que se preste debe estar predicada realmente en un peritaje superior demostrado por la agencia. Si las decisiones de las agencias no cumplen con esas expectativas, entonces es necesaria una mayor participación de los tribunales. **Tal incumplimiento justifica la intervención judicial porque pone de manifiesto que hay falta de entendimiento del objetivo y de la política**

**pública a ser alcanzada y desarrollada por el organismo administrativo.** D. Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, Bogotá, Ed. Forum, 1993, pág. 505.

(Énfasis nuestro).

En conclusión, "los tribunales no [podemos] imprimirle un sello de corrección, so pretexto de deferencia, a las determinaciones o interpretaciones administrativas irrazonables o ilegales, o simplemente, contrarias a derecho". Empresas Ferrer v. A.R.Pe., *supra*, a la pág. 264.

Una vez establecido el derecho aplicable al caso, procedemos a adjudicar las controversias planteadas.

## VI

### A. CERTIFICACIÓN COMO FACILIDAD EXENTA

Establece el Artículo VI, Sección 19 de la Constitución de Puerto Rico, L.P.R.A., Tomo 1, que será política pública del Gobierno de Puerto Rico "la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad…." Art. VI, Sec. 19, Const. de Puerto Rico, L.P.R.A., Tomo 1, ed. 2008, pág. 440. Lamentablemente, y según podemos constatar frecuentemente en nuestros medios informativos, en Puerto Rico estamos viviendo un problema, a gran escala, por la cantidad de basura que se genera diariamente.

Precisamente, el recurso ante nuestra consideración tiene como base cuestionamientos procesales sobre una de las estrategias desarrolladas por el Gobierno para lidiar con tan precaria situación.

Reconociendo al reciclaje como una de las alternativas que de forma más efectiva podía ayudar a reducir la acumulación desmedida de desperdicios sólidos en los pocos vertederos operantes en Puerto Rico,[19] el 18 de septiembre de 1992 la Asamblea Legislativa aprobó la "Ley para la Reducción y el Reciclaje de los Desperdicios Sólidos en Puerto Rico".[20] Mediante la misma, estableció como política pública del Gobierno de Puerto Rico la implantación de estrategias económicamente viables y ambientalmente seguras que resultaran en la disminución del volumen de los desperdicios sólidos, entre las que destacó el reciclaje.[21]

---

[19]   Valga señalar que en el 1994 la Agencia Federal de Protección Ambiental (EPA) y la Junta de Calidad Ambiental (JCA), cerraron 32 de los 61 vertederos que operaban a esa fecha, por incumplimiento con los estándares ambientales. "Estos cierres tuvieron como resultado reducir a casi la mitad la cantidad de [vertederos] disponibles para la disposición de los desperdicios sólidos en Puerto Rico." Resolución sobre Aclaratoria e Interpretación de Política Pública aplicable a los Sistemas de Relleno Sanitario, R-11-16-5, aprobada por la Junta de Calidad Ambiental el 30 de septiembre de 2011.

[20]   Ley 70-1992.

[21]   Es menester señalar que a pesar de que desde el 1992 se estableció el reciclaje como uno de los métodos principales en los asuntos de la política pública ambiental, recientemente entró en vigor la Resolución 11-16-5 de la JCA que tiene como meta ulterior elevar la tasa de reciclaje en la Isla, debido a que actualmente la misma es de sólo once punto tres por ciento (11.3%), cuando según las disposiciones de la Ley 70-1992 debía haber sido de un treinta y cinco por ciento (35%). G. Alvarado, *supra*, a las págs. 4-5; Resolución sobre Aclaratoria e Interpretación de Política Pública aplicable a los Sistemas de Relleno Sanitario, R-11-16-5, aprobada por la Junta de Calidad Ambiental el 30 de septiembre de 2011.

Posteriormente, mediante la Ley 15-1995, se pretendió solidificar la estrategia del reciclaje, mediante la incentivación de la industria privada en el desarrollo e implantación de facilidades de reducción, disposición y/o tratamiento de desperdicios sólidos. De las Exposiciones de Motivos, al igual que el historial legislativo de las disposiciones legales antes mencionadas, se desprende que la política pública del Gobierno de Puerto Rico, así como lo que se pretendió lograr con la creación de ambas legislaciones, fue la implantación de un programa efectivo de reducción y reciclaje de desperdicios sólidos.

Con lo anterior como trasfondo, comenzamos aclarando que, en el caso de autos, la Autoridad en su comparecencia ante este Tribunal, hizo unas aseveraciones en su primer señalamiento de error que no son correctas. Señaló que el TA había reconocido el derecho a un crédito del cincuenta por ciento (50%) de las aportaciones realizadas por los inversionistas a las plantas de reciclaje **sin tener que cualificárseles como facilidades exentas.**

Efectivamente, de un examen de las leyes pertinentes al caso ante nos se desprende que el propósito de la Legislatura al aprobar las mismas fue incluir a las empresas privadas como un componente importante en la disposición y el procesamiento de los desperdicios sólidos. Para lograrlo estableció, como materia de derecho, un incentivo de créditos contributivos a aquellas

facilidades exentas que realizaran inversiones destinadas a reducir, disponer o tratar los desperdicios sólidos.

En su apreciación, el TA correctamente reconoció el beneficio de los créditos contributivos como un derecho. Sin embargo, contrario a lo alegado por la Autoridad, de la Sentencia emitida por el TA no se desprende que ese derecho proceda en ausencia de una certificación como facilidad exenta.

Es decir, en ningún momento el TA aseveró que a las industrias que llevaran a cabo actividades relacionadas a la disposición y procesamiento de los desperdicios sólidos le correspondía dicho derecho de manera automática. A tenor con lo anterior y con las disposiciones legales pertinentes, cualquier entidad que desee recibir los beneficios de los créditos contributivos y que no haya sido certificada anteriormente como facilidad exenta, tiene que, ineludiblemente, ser certificada como facilidad exenta para ser acreedora de los mismos. Sin embargo, como veremos más adelante en nuestra discusión, una vez certificada, va a depender de la naturaleza de los proyectos que la entidad vaya a llevar a cabo para renovar o expandir sus facilidades, si la misma tuviera que pasar de nuevo por el proceso de certificación. Por lo tanto, el TA no cometió el primer error señalado por la Autoridad.

En cuanto al segundo señalamiento de error, la peticionaria alega que IFCO tenía que certificarse

nuevamente como facilidad exenta para obtener los nuevos créditos contributivos solicitados. Sin embargo, de una evaluación de las disposiciones legales pertinentes podemos concluir que no es lógica, ni razonable la interpretación que la Autoridad pretende hacer de las mismas para llegar a tal determinación.

Sin lugar a dudas, no puede ser cónsono con los motivos que propiciaron la aprobación de la Ley 70-1978 y con el Reglamento 5880, el requerir que IFCO vuelva a pasar por el proceso de solicitar una certificación como facilidad exenta para recibir créditos basados en una renovación dirigida a realizar precisamente el mismo tipo de actividad por la que fue certificada inicialmente. ¿Cómo puede la Autoridad fomentar e incentivar la participación de la industria privada en el reciclaje requiriéndole que cada vez que vaya a realizar una renovación o expansión sustancial de sus facilidades, tenga que pasar por el proceso completo de certificación como facilidad exenta, requerido a cualquier otra entidad que recién comienza operaciones?

La Autoridad sustenta sus alegaciones en las menciones que aparecen en las disposiciones de la Sección 3 del Reglamento 5880 relativas a las facilidades existentes. Sin embargo, al evaluar dichas disposiciones entendemos que resulta más razonable y más acorde con la política pública reconocida y con los motivos que alentaron la aprobación de la Ley 70-1992, Ley 15-1995 y

Ley 104-1996,[22] la conclusión de que a quienes se refiere dicha sección de la ley con el término "facilidades existentes" es a aquellas industrias en operación, que no han sido previamente certificadas y que planifican llevar a cabo una renovación o expansión sustancial de sus facilidades. Lo anterior va respaldado por la definición de "facilidad existente" de la Sección 2-6 del Reglamento 5880, la cual indica que se refiere a aquellos negocios en operación, al momento de radicar la certificación de facilidad exenta bajo la Sección 3 del Reglamento, que van a emprender una renovación o expansión sustancial.

Para lograr armonizar los propósitos que propiciaron las legislaciones pertinentes al caso de autos, con las disposiciones del Reglamento 5880, no cabe conclusión más lógica que considerar las "facilidades existentes" a las que se refiere la Sección 3 del Reglamento 5880 como aquellas industrias en operación que no han sido certificadas como facilidades exentas, pero que desean ser certificadas como tal para recibir los créditos

---

[22] Cabe señalar que, a tono con dicha política pública, en la Exposición de Motivos de la Ley 135-1997, *supra*, en virtud de la cual se conceden los créditos contributivos por inversión del Artículo 21 de la Ley 70-1978, se expresó lo siguiente:

> [L]os modelos económicos a nivel mundial han cambiado significativamente en los últimos años, por lo que es necesario adoptar unos nuevos incentivos contributivos y no contributivos que estén más a tono con las necesidades cambiantes de la industria para asegurar que Puerto Rico se mantenga competitivo a nivel mundial como localización de los negocios.
>
> Además de reducir los costos de hacer negocios en Puerto Rico, en términos generales, **es necesario reducir la burocracia y la complejidad del programa de incentivos para el desarrollo económico de Puerto Rico**….

(Énfasis nuestro).

contributivos por una renovación a realizarse. Dicha interpretación sería la única que le daría sentido a los fines que se pretenden alcanzar con la adopción de los créditos contributivos por inversión en facilidades de reciclaje.

Acorde con lo anterior, el TA se expresó en los siguientes términos, con relación a las industrias que han sido certificadas como exentas y que van a llevar a cabo una renovación o expansión sustancial:

> [E]s razonable que se examine la naturaleza de la operación que obtuvo la Certificación de Facilidad Exenta y se compare con la de la expansión propuesta. Si no se discierne un cambio significativo, entonces no existe razón para requerir que se repita el proceso de calificar como Facilidad Exenta. Si se determina que la actividad es diferente, la Autoridad debe exponer el fundamento para dicha conclusión y entonces proceder a solicitar que se le demuestre que la expansión debe calificar bajo los requisitos de "Facilidad Exenta"…. El concepto de renovación incluye el utilizar una tecnología más adelantada o eficiente. Por lo tanto, lo fundamental es examinar si la operación mantiene la naturaleza de transformar insumos ("inputs") de desperdicios sólidos a material reciclable.
>
> Nos resulta claro, que sólo cuando se concluye que la expansión envuelve una actividad diferente, es que procedería evaluar una propuesta de expansión bajo los criterios necesarios para calificar como una Facilidad Exenta. Si no existe tal diferencia, entonces lo que procede es indagar si el proyecto de expansión llena lo requerido por el Reglamento en la "Sección 2-13 Renovación o Expansión Sustancial". El volver a calificar el proyecto de expansión o renovación como una Facilidad Exenta, cuando no existe cambio de la actividad por la cual antes se calificó la facilidad como Facilidad Exenta, no lo autoriza ni requiere la ley y, además, conlleva una demora y gastos adicionales que no se justifican cuando la

naturaleza de la operación es la misma que la del proyecto original, el cual luego de evaluación por la Autoridad obtuvo Certificación de Facilidad Exenta.

Sentencia del TA, a las págs. 21-23 (énfasis en el original).

Entendemos acertada la conclusión a la que llega el TA y coincidimos con su interpretación en torno a que sólo en aquellos casos en los cuales la facilidad exenta va a realizar una actividad distinta a aquella por la cual se le concedió el certificado de exención contributiva, es que resulta meritorio que se vuelva a evaluar y a cualificar como tal.

Cabe señalar que IFCO fue certificada como facilidad exenta en virtud de lo dispuesto en el inciso (c) de la Sección 2-5 del Reglamento 5880 y en el inciso (g) del Artículo 21 de la Ley 70-1978. Según dichos preceptos, la Autoridad verificó lo siguiente: (1) que sus actividades estuvieran en armonía con el Plan Regional de Infraestructura para el Reciclaje y Disposición de los Desperdicios Sólidos, (2) que promovieran la reducción, reuso y reciclaje de los desperdicios sólidos, (3) que se utilizara una tecnología ambientalmente segura y probada, y (4) que se cumpliera con todas las reglamentaciones estatales y federales aplicables. Además, IFCO tuvo que someter todos y cada uno de los documentos exigidos por la Sección 3 del Reglamento 5880. Resulta, pues, evidente que, para obtener su certificado de exención contributiva

IFCO ya fue sometida anteriormente a una evaluación rigurosa por parte de la Autoridad, por lo que no es meritorio ni razonable que tenga que volver a ser cualificada por una expansión dirigida a realizar precisamente el mismo tipo de actividad que ya realizaba.

Como bien expresara el TA en su Sentencia:

> [E]l requerir que una propuesta de expansión de una Facilidad ya exenta se evalúe bajo los criterios necesario[s] para obtener una Certificación de Facilidad Exenta, convertiría el proceso de expansión en uno aún más oneroso que uno original, pues, además de los requisitos para Facilidad Exenta original, la expansión tiene que cumplir con el requisito particular de la Sección 2-13 del Reglamento, *ante*, como **Expansión Sustancial**, lo cual le impone un requisito de un tamaño mínimo al proyecto, que no existe ni requiere al evaluarse el proyecto original. Ello resulta en la anomalía de que un proyecto de expansión, el cual usualmente es un apéndice más pequeño que el original, requeriría de requisitos más onerosos para su aprobación, que el proyecto original. Se trata de un absurdo….

Sentencia del TA, a las págs. 23-24 (énfasis en el original y citas omitidas).

Esto no quiere decir, sin embargo, que IFCO no tenga que cumplir con una serie de requisitos ni tenga que ser sometida a unas evaluaciones para recibir los créditos que está solicitando por la renovación o expansión sustancial. Como bien se desprende de la determinación del foro apelativo intermedio antes citada, para recibir los créditos por la expansión sustancial IFCO tendría que, de todos modos, cumplir con las disposiciones de la Sección 2-13 del Reglamento 5880.

Al llegar a este punto, es menester señalar que el Reglamento 5880, por contener asuntos de carácter fiscal, fue también aprobado por el Departamento de Hacienda. De ese modo, es forzosa la conclusión de que el Secretario de Hacienda se encontraba y se encuentra en la misma posición que la Autoridad para interpretar las disposiciones del mismo. De acuerdo con lo anterior, el 15 de abril de 2005 el Secretario de Hacienda suscribió una carta en respuesta a la solicitud de enmienda a la certificación sometida por IFCO, en la que reconoció que para obtener dichos créditos, el procedimiento que IFCO tenía que completar era aquel requerido en la Sección 2-13 del Reglamento 5880. En lo pertinente, manifestó lo siguiente en su comunicación:

> Luego de evaluar la solicitud presentada por la Peticionaria consideramos **que la misma debe evaluarse bajo las disposiciones de la Sección 2-13 del Reglamento 5880,** como una expansión de las operaciones de la Peticionaria y no como una enmienda a la Certificación, según fue solicitado.

(Énfasis nuestro).

De otro lado, queremos dejar claro que con nuestra decisión no estamos abandonando la norma de deferencia judicial que se le concede a las interpretaciones que realicen las agencias administrativas de sus leyes orgánicas. Debemos tener presente que se trata de una situación particular en la cual la agencia está realizando una interpretación de su propio Reglamento, el cual contiene un lenguaje que resulta ambiguo y confuso. Ante

estas circunstancias, no tenemos otra alternativa que guiarnos por las normas de interpretación estatutaria, esbozadas anteriormente, que nos dirigen hacia la consideración del propósito o la intención que perseguía la Legislatura al aprobar dicha legislación.

Como indicáramos anteriormente, el propósito social por el cual se aprobó la disposición relativa a la concesión de créditos contributivos, y las enmiendas posteriores a la misma, iba dirigido a flexibilizar y promover que más industrias privadas participaran en la ardua tarea que representa el manejo de los desperdicios sólidos. Requerir que IFCO vuelva a pasar por el proceso de certificación para recibir los créditos por una expansión dirigida a realizar la misma actividad que realizaba antes, va a todas luces en contra del motivo con el cual se aprobó la legislación en cuestión.

Además, es de todos conocido que los reglamentos administrativos no pueden ir en contra de lo que la Legislatura pretendió atender con la aprobación de la ley. Es decir, "un reglamento promulgado para implementar la ejecución de una ley puede complementarla, pero no estar en conflicto con ésta". P.S.P. v. Com. Estatal de Elecciones, 110 D.P.R. 400, 409 (1980).

Cónsono con lo anterior, y según señaláramos anteriormente, uno de los propósitos de la revisión judicial es asegurar que los organismos administrativos actúen en forma compatible con la política pública

legislativa. Es por dicha razón que recientemente expresamos en Báez Rodríguez v. E.L.A., *supra*, a la pág. 245 que: "cuando el objeto de interpretación es una enmienda a la ley, debemos siempre tener en cuenta que no podemos imputar a la Asamblea Legislativa la realización de un acto inútil al haberla aprobado". Así, cuando se enmendó la Ley 70-1978 para reconocer el derecho a la obtención de créditos contributivos a cierto tipo de industrias, se hizo con el propósito de promover e incentivar la operación de más industrias privadas en las operaciones de reciclaje y manejo de desperdicios sólidos y no para crearle trabas en la instalación y expansión de sus operaciones.

Debemos tener presente que, después de todo, la decisión que hoy tomamos, además de estar a favor de la política pública de desarrollar un programa amplio de reciclaje - que incluya la participación activa de la industria privada - no representa una amenaza a las facultades y a los poderes de la Autoridad. Por el contrario, la Autoridad, según disposiciones de su Ley Orgánica y del Reglamento 5880, tiene la potestad de exigir informes a todas aquellas industrias que estén participando en el manejo de los desperdicios sólidos. Ésta sirve como herramienta útil para monitorear y mantener un control efectivo para asegurar que dichas entidades estén llevando a cabo las actividades por las cuales se les certificó como facilidad exenta y que

sirvieron de base para el beneficio de los créditos contributivos.

Sin lugar a dudas, la preparación de informes representa un requisito mucho menos oneroso que tener que cumplimentar el engorroso proceso de cualificar como facilidad exenta, cada vez que una facilidad exenta va a llevar a cabo una expansión o renovación de sus operaciones. Al ser certificadas inicialmente como facilidades exentas, ciertamente estas industrias tuvieron que atravesar un proceso de evaluación de sus operaciones para ser acreedoras de los beneficios de los créditos contributivos.

Además, a pesar de lo que resolvemos en el día de hoy, todavía las entidades concernidas tendrán que pasar por un proceso de evaluación para lograr obtener créditos contributivos por expansiones o renovaciones sustanciales. Esto es, todavía IFCO tendría que demostrar que su inversión es elegible porque: (1) se trata de una cantidad de efectivo a ser aportada a una facilidad exenta a cambio de acciones en la corporación o participación en la sociedad; (2) se está aportando capital adicional al negocio y no meramente reemplazando capital ya existente (emisión primaria); (3) la inversión ha de ser utilizada única y exclusivamente para la construcción, incluyendo el costo de equipo y materiales para los cuales no se han otorgado créditos contributivos anteriormente; (4) la inversión está dirigida a renovar, remodelar o ampliar las

facilidades físicas y (5) la inversión conlleva un costo mínimo de doscientos cincuenta mil dólares ($250,000.00) o veinticinco por ciento (25%) del justo valor en el mercado de todos los activos de la facilidad existente, lo que sea mayor.

En el caso de autos, los esfuerzos de IFCO iban dirigidos precisamente a ampliar y renovar sus facilidades físicas, mediante una inversión adicional de efectivo, la cual habría de ser utilizada única y exclusivamente en la compra de materiales y equipos nuevos y en el desarrollo de nuevas facilidades. Además, la inversión ascendía a cinco millones cien mil dólares ($5,100,000.00), es decir, mayor al veinticinco por ciento (25%) de todos los activos de IFCO y anteriormente no se habían otorgado créditos contributivos por ésta.

Si lo que ha pretendido la ley es incentivar la participación de la industria privada en la solución de un problema que nos afecta a todos – como lo es la producción de toneladas de desperdicios sólidos diariamente y la escasez de vertederos donde almacenar las mismas – no podemos justificar los requerimientos de la Autoridad de hacerle el camino más tortuoso a una industria que, al ampliar sus operaciones, contribuye a erradicar tan preocupante problema.

Después de todo, y aún con toda la deferencia que se le concede a las agencias administrativas por su conocimiento especializado, debemos tener presente que es

finalmente a los tribunales y en especial a esta Curia, a quien le corresponde evaluar las actuaciones administrativas para determinar si las mismas se ajustan al ámbito prescrito en su ley habilitadora. López Leyro v. E.L.A., 173 D.P.R. 15, 16 esc. 2 (2008). Sin duda alguna, y en cumplimiento con esa misión, velaremos por que "las interpretaciones que las agencias realicen de sus propios reglamentos [estén amparadas] en la razón y en la afinidad con sus leyes habilitadoras". Íd. a la pág. 26. A fin de cuentas "no se trata de aplicar con lógica mecánica determinada interpretación, sino de formular aquella que sea cónsona con las necesidades contemporáneas de nuestra sociedad y con la intención original de la ley según fue aprobada". Íd. a la pág. 27. En definitiva, "no pod[e]mos ignorar que las leyes se aprueban con un fin", por lo que "[n]o debemos reducirlas a la futilidad mediante interpretaciones textuales que trunquen su fuerza y propósito". Íd. a la pág. 27.

Por tanto, no erró el TA al determinar que IFCO no tiene que ser calificada ni evaluada nuevamente como facilidad exenta para poder recibir créditos contributivos por la renovación o expansión sustancial a realizarse, dado que ésta había obtenido un certificado de exención contributiva previamente.

### B.   ELEGIBILIDAD DE LA INVERSIÓN

Finalmente, en su tercer señalamiento de error, la Autoridad aduce que la inversión que IFCO habrá de

realizar no es elegible para recibir los créditos contributivos. Ésta sustentó su determinación en: (1) el hecho de que la operación e infraestructura de IFCO es similar a la de otras industrias existentes en el país, (2) que ya habían recibido sobre dos millones doscientos mil dólares ($2,200,000.00) en créditos contributivos, y (3) que el área de estacionamiento a construirse no estaba relacionada con la actividad de reciclaje.

Los únicos requisitos que se desprenden de la Ley 70-1978 y del Reglamento 5880 para que una inversión pueda catalogarse como elegible es que la misma vaya a ser utilizada en su totalidad, única y exclusivamente en una facilidad de disposición y/o tratamiento de desperdicios sólidos y que anteriormente no se hayan otorgado créditos contributivos por esa nueva inversión. Por lo tanto, ni en la Ley ni en el Reglamento existen limitaciones en cuanto a la cantidad de créditos a concederse, ni sobre consideraciones de índole geográficas. Además, si consideramos la cantidad de desperdicios sólidos que recibe una planta de reciclaje y la cantidad que igualmente se genera entre el producto reciclado y el remanente, es evidente que la inversión en contenedores y en áreas donde recibir y estacionar los camiones con desperdicios sólidos está intrínsecamente relacionada con la actividad de reciclaje.

En conclusión, la Autoridad no presentó en su resolución razones válidas en apoyo de su determinación.

Además, de un análisis exhaustivo de la Ley 70-1978 y del Reglamento 5880, no se desprenden disposiciones que sirvan como base para tal dictamen. En consecuencia, concluimos que la determinación de que la inversión a realizarse por IFCO no era elegible para los créditos contributivos, es irrazonable y arbitraria.

Por tanto, no erró el TA al resolver que la inversión adicional a realizarse por IFCO en la renovación o expansión de su empresa es elegible para recibir los créditos contributivos que dispone el Artículo 21 de la Ley 70-1978 y el Reglamento 5880.

## VII

El incentivo a las industrias privadas para que éstas participen en la reducción, disposición y tratamiento de desperdicios sólidos, además de contribuir a la solución de un problema ambiental de gran magnitud, ayuda al Gobierno a cumplir con su política pública, a la vez que reduce el expendio de los fondos designados para esos fines. La interpretación que realice la Autoridad de su Reglamento no puede ser incompatible con la política pública plasmada en la ley. Es a la Rama Legislativa a quien corresponde establecer los asuntos fundamentales de política pública y los directores de las agencias y entidades de la Rama Ejecutiva vienen obligados a interpretar dichas leyes de modo consistente con los propósitos que tuvo la Legislatura al aprobarlas.

Por las razones antes expuestas, se confirma la Sentencia del Tribunal de Apelaciones.

Se dictará Sentencia de conformidad.

Roberto Feliberti Cintrón
Juez Asociado

EN EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| IFCO RECYCLING, INC.<br><br>RECURRIDA<br><br>v.<br><br>AUTORIDAD DE DESPERDICIOS SÓLIDOS<br><br>PETICIONARIA | **Núm.:** <u>CC-2007-0095</u> | *Certiorari* |

SENTENCIA

En San Juan, Puerto Rico, a 27 de febrero de 2012.

Por los fundamentos antes expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente Sentencia, se confirma la Sentencia del Tribunal de Apelaciones.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez inhibida.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo